IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DARRELL EUGENE WILLIAMS,<br><br>               *Plaintiff*,<br><br>   v.<br><br>ALLEGHENY COUNTY *as owner and operator of John J. Kane Regional Center-SC doing business as* KANE SCOTT CENTER, *et al*,<br><br>               *Defendants*. | Civil Action No. 2:21-cv-656<br><br>Hon. William S. Stickman IV |

## **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

      Plaintiff Darrell E. Williams ("Williams") initiated this action against Defendant Allegheny County ("Kane") as the owner and operator of John J. Kane Regional Center-SC, d/b/a Kane Scott Center and Defendants Aetna Life Insurance Company ("ALIC"), Aetna Inc., and Aetna Health, Inc., (collectively, "Aetna") individually and on behalf of the Estate of Moneena Williams ("M.W."). Williams brings a claim against Kane under 42 U.S.C. § 1983, alleging that Kane deprived the decedent of her civil rights by violating the Federal Nursing Home Reform Act ("FNHRA"), 42 U.S.C. 1396r *et. seq.*, and its implementing regulations 42 C.F.R. 483 *et. seq.* (Count I). Williams also brings claims for Breach of Fiduciary Duty (Count II), Breach of Contract (Count III), and Breach of Good Faith and Fair Dealing (Count IV) against M.W.'s insurance provider, Aetna, alleging that Aetna wrongfully denied M.W. coverage for skilled nursing care in May of 2019. Four motions are presently before the Court: Aetna's Motion to Strike Plaintiff's Appendix Exhibits B and C (ECF No. 74); Kane's Motion for Summary Judgment (ECF No. 54);

1

Aetna's Motion for Summary Judgment (ECF No. 58); and Williams' Motion for Summary Judgment (ECF No. 63). For the reasons set forth below, Williams' Motion for Summary Judgment (ECF No. 63) will be denied; Kane's Motion for Summary Judgment (ECF No. 54) will be granted; and Aetna's Motion for Summary Judgement (ECF No. 58) will be granted. Aetna's Motion to Strike Plaintiff's Appendix Exhibits B and C (ECF No. 74) will be denied as moot.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Williams is the son and Personal Representative of the Estate of M.W., who died on May 11, 2020. (ECF No. 1, ¶ 3). The John J. Kane Regional Center is a skilled nursing facility in Pittsburgh, Pennsylvania that is owned and operated by Allegheny County. (*Id.* ¶¶ 4-6). At all relevant times, M.W. was a member of Aetna Medicare Plan ("Plan"), a Medicare Advantage PPO Plan, offered by ALIC. (ECF No. 61-2). Under this Plan, M.W. was covered by Medicare and received covered Medicare health care through the Plan. (*Id.* at 3). The Plan covered "everything that Original Medicare cover[ed,]" but did not cover "[s]ervices considered not reasonable and necessary, according to the standards of Original Medicare." (*Id.* at 6, 7). The Plan required ALIC to "follow Original Medicare's coverage rules." (*Id.* at 4).

On April 24, 2019, Dr. Michael Madigan ("Dr. Madigan") diagnosed M.W. with a ruptured popliteal aneurysm in her right leg. (ECF No. 55, ¶¶ 1-2); (ECF No. 56-2). At that appointment, Dr. Madigan discussed his treatment recommendations and "the possibility of right [a]bove the knee amputation given that amputation is a high risk for ruptured aneurysms." (ECF No. 56-2, p. 2). Shortly after M.W. received that diagnosis, Kane requested that M.W. be admitted to its Skilled Nursing Facility ("SNF") and, the next day, Aetna approved six days of coverage for M.W.'s stay at Kane's SNF. (ECF No. 60, ¶¶ 21-22). *See also* (ECF Nos. 61-5, 61-6). M.W. was admitted to

Kane's SNF on May 2, 2019, for rehabilitation of her ruptured popliteal aneurysm. (ECF No. 55, ¶ 5). M.W.'s wound was examined by Kane staff on the day she was admitted, and was measured at 18 centimeters long, 6.5 centimeters wide, and 5 centimeters deep. (ECF No. 56-4, p. 2). On May 3, 2019, M.W. was seen by her attending physician, Dr. Mario Fatigati ("Dr. Fatigati"), who noted that "[t]he vascular aspects of [M.W.'s] leg are tenuous[,]" and ordered changes to the treatment of M.W.'s wound. (ECF No. 56-3, p. 3). *See also* (ECF No. 55, ¶ 10).

On May 7, 2019, the day coverage for M.W.'s stay in the SNF was set to expire, ALIC received a request from M.W. for continued stay at Kane's SNF, which it approved through May 14, 2019. (ECF No. 61-8, p. 2). On that same day, M.W.'s wound was examined again and measured at 18 centimeters long, 7 centimeters wide, and 8 centimeters deep. (ECF No. 55, ¶ 12); (ECF No. 56-5). Certified Registered Nurse Practitioner ("CRNP") Karen Zagrocki ("Zagrocki") "issued an order to discontinue previous treatment to popliteal area, and to apply Silvadene cream to the wound after cleaning. The wound vac was to remain in place." (ECF No. 55, ¶ 11). The next day, M.W. had a follow up appointment with Zagrocki, who noted that the wound vac was in place, that the wound had cellulitis with a possible pseudomonas infection, and that there was "yellowish, greenish, tannish drainage to the posterior right thigh wound." (*Id.* ¶ 13); (ECF No. 56-5, p. 4). Dr. Fatigati also conducted an examination of M.W.'s wound on May 8, 2019, during which he noted the presence of a foul-smelling drainage, indicated that the wound would be treated with antibiotics, and expressed concern for the "viability of the leg." (*Id.* ¶ 14); (ECF No. 56-5, p. 5). M.W.'s wound was examined again on May 9, May 10, and May 13, 2019, and large amounts of discharge was noted. (*Id.* ¶¶ 15-16); (ECF Nos. 56-4, 56-5). On May 14, M.W.'s wound was measured at 8 centimeters long, 9 centimeters wide, and 0.5 centimeters deep and Zagrocki issued a series of orders regarding the treatment of M.W.'s wound, including one discontinuing the use

3

of Silvadene in favor of Santyl. (*Id.* ¶¶ 18-19); (ECF Nos. 56-4, 56-5). Zagrocki followed up the next day and noted that M.W. had been fully treated with antibiotics and that her wound had improved. (*Id.* ¶ 20); (ECF No. 56-5).

On May 16, 2019, M.W. had an appointment at the office of her vascular surgeon, after which, CRNP Megan Laughlin ("Laughlin") sent a letter stating that M.W.'s wounds were "overall looking good" and providing instructions for M.W.'s continued treatment. (ECF No. 64, ¶ 8). The letter instructed M.W.'s caretakers to: continue applying santyl and prysma to M.W.'s wounds; "[c]ontinue white foam to all tunneling wounds to anterior knee and calf wound, covered by black foam@125mm hg continuous suction[;]" change the wound vac three times per week; and to continue prysma to left groin. (*Id.*). The letter also indicated that M.W. was scheduled for a follow-up appointment in two weeks for "likely suture removal." (*Id.*). Williams attended the May 16 appointment with M.W. and was told by Laughlin that M.W. "is not out of the woods" and that she "could still lose her leg." (ECF No. 56-6, p. 15). Laughlin also told Williams that she was impressed with how well the Kane SNF nurses were taking care of M.W.'s wound. (*Id.*); (ECF No. 69, p. 7). ALIC approved coverage for SNF services through May 18, 2019, but also issued a Notice of Medicare Non-Coverage ("NOMNC"), notifying M.W. that SNF services would not be covered after May 18, 2019. (ECF No. 60, ¶ 36); (ECF Nos. 61-12, 61-15). On May 17, 2019, M.W. was discharged from occupational therapy and physical therapy by Kane staff. (ECF Nos. 61-13, 61-14).

On May 18, 2019, M.W. was moved from SNF to Kane's long-term care ("LTC") facility. (ECF No. 55, ¶ 29). Nurse notes from the following day indicate that M.W.'s vitals were recorded and that she had a wound vac in place in LTC. (*Id.* ¶ 31); (ECF No. 56-4). On May 21, 2019, Kane staff examined M.W.'s wound, which measured at 10 centimeters long, 3 centimeters wide,

and 9.2 centimeters deep. (*Id.* ¶ 32); (ECF No. 56-4). After this examination, a Kane nurse spoke with the office of M.W.'s vascular surgeon to alert them of the increased depth of M.W.'s wound. (*Id.* ¶ 34). Shortly thereafter, in the morning of May 21, Laughlin arrived at Kane to examine M.W.'s wound and advised Kane staff to continue with the same treatment. (*Id.* ¶ 35); (ECF No. 56-4).

Kane nurses checked on M.W. on May 22, 2019, and again during the early morning of May 23. (*Id.* ¶ 37); (ECF No. 56-4, p. 6). Nurse notes from the evening of May 23, 2019 indicate that the skin on M.W.'s lower right leg was warm and dry and that the wound vac was intact. (*Id.* ¶ 38). According to M.W.'s therapy administration records ("TAR"), Kane staff applied Santyl cream to her wound every day from May 15, 2019, to May 28, 2019. (ECF No. 64, ¶ 35); (ECF No. 56-7, p. 2). Additionally, M.W.'s wound vac was changed, with white foam placed into all areas of tunnelling on May 14, 16, 18, 21, 23, and 25, 2019. (*Id.* ¶ 36); (ECF No. 56-7, p. 3). M.W. attended her follow up appointment with her vascular surgeon on May 28, 2019. (ECF No. 55, ¶ 42). After examining her wound, the physician had M.W. transported to UPMC Presbyterian for debridement, which was scheduled for May 30. (*Id.* ¶ 43); (ECF No. 69, p. 11). Ultimately, M.W.'s right leg was amputated at UPMC-Presbyterian in early June of 2019. (*Id.* ¶ 44); (ECF No. 64, ¶ 37).

   B. **Administrative Proceedings**

After receiving the NOMNC from ALIC on May 16, 2019, M.W. appealed to the state Quality Improvement Organization ("QIO"), Livanta LLC. (ECF No. 64, ¶ 10). On May 17, 2019, after being verbally notified that the QIO affirmed ALIC's decision of noncoverage, M.W. submitted a request for an expedited reconsideration by C2 Innovative Solutions, the Qualified Independent Contractor ("QIC"). (*Id.* ¶ 12). On May 22, 2019, the QIC issued a decision

5

upholding the denial of coverage, explaining that, based on the medical record, "Medicare criteria for coverage of the skilled services at issue ha[d] not been satisfied." (ECF No. 61-18, p. 4). M.W. filed a timely request for review with the office of Medicare Hearings and Appeals ("OMHA"). *See* (ECF No. 61-16). In August of 2019, a hearing with the Administrative Law Judge ("ALJ") was held and, on September 9, 2019, the ALJ issued a decision upholding ALIC's termination of coverage because M.W. "no longer needed and did not receive a covered level of [SNF] care after the termination of Medicare coverage on May 18, 2019." (*Id.* at 10); (ECF No. 64, ¶ 18). M.W. filed a Request for Review of the ALJ Decision with the Medicare Appeals Council ("MAC"), dated November 1, 2019. (ECF No. 60, ¶ 71); (ECF No. 1-3, p. 2). Sometime in December of 2019 or January of 2020, M.W. received an Acknowledgment of Request for Review from the Departmental Appeals Board, stating that "it may be several months before the Medicare Appeals Council can act on your request for review." (ECF No. 61-19, p. 2). Beyond this Acknowledgement of Request for Review, Williams has not received a decision or any other communications from the MAC. (ECF No. 66-1, p. 152); (ECF No. 71, p. 24). M.W. died on May 11, 2020, and, on May 18, 2021, Williams initiated this action individually and on behalf of M.W.'s Estate. (ECF No. 1, ¶ 3).

## II.     LEGAL STANDARD

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining for each side whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2016)).

### III. ANALYSIS

#### A. Williams' Motion for Summary Judgment (ECF No. 63)

Williams moves for summary judgment on his claim against Kane (Count I) and his three claims against Aetna (Counts II-IV). (ECF No. 63). In support of his motion for summary judgment, Williams claims that M.W. received a lower level of wound care in the LTC, and that "[m]onitoring and assessment of [M.W.'s] wound was discontinued after May 23, 2019, and therefore 'daily' wound care services did not occur according to the Vascular surgeon's order; nor to Kane's wound care policy or the FNHRA's requirements." (*Id.* at 3). From this, Williams surmises that "the only issue that remains is whether a right leg above knee amputation of [M.W.] following [M.W.'s] follow-up appointment dated May 28, 2019 would be considered a decline in her wound." (*Id.*). Williams then concludes that the amputation of M.W.'s leg "would be considered a decline in her wound." (*Id.*).

As the moving party, Williams bears the burden of showing that these facts "cannot be genuinely disputed by citing to particular parts of materials in the record—i.e., depositions,

7

documents, affidavits, stipulations, or other materials[.]" *Mosaka-Wright v. LaRoche Coll.*, No. 11CV1139, 2012 WL 3060151, at *2 (W.D. Pa. July 25, 2012), aff'd sub nom. *Mosaka-Wright v. La Roche Coll.*, 523 F. App'x 886 (3d Cir. 2013). Williams provides no support for any of his factual assertions. In fact, his motion and supporting memorandum contain no citations to the record. Thus, Williams has failed to establish that any of his factual claims are undisputed based on the record. The Court "will not scour the record where movant has not cited it to see if the record might relate in some way to what he might be driving at[.]" *United States v. Grados*, No. 2:16-CR-57-KRG-KAP, 2021 WL 231373, at *3 (W.D. Pa. Jan. 4, 2021).

Williams' motion and supporting memorandum also fail to "address applicable law" and explain why he "is entitled to judgment as a matter of law" as required by the Local Rules of the United States District Court for the Western District of Pennsylvania. LCvR 56(B)(2). Williams does not distinguish between his claim against Kane and his claims against the Aetna Defendants. He does not specify which facts (or what legal arguments) support each specific claim. In fact, Williams fails to discuss any of the individual claims or the essential elements of those claims. He fails to cite any of the relevant statutes, regulations, or case law and makes no attempt to apply the governing law to the facts in the record. Williams' motion for summary judgment utterly fails to establish that the facts put forth are undisputed or to explain why he is entitled to judgment as a matter of law. Given these deficiencies, Williams' motion for summary judgment (ECF No. 63) will be denied. Aetna's Motion to Strike Plaintiff's Appendix Exhibits B and C (ECF No. 74) will be denied as moot.

### B. Kane's Motion for Summary Judgment (ECF No. 54)

At Count I of the Complaint, Williams brings a claim against Kane under 42 U.S.C. § 1983 ("Section 1983" or "1983").[1] (ECF No. 1). "A prima facie case under § 1983 requires a plaintiff to demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). Kane does not "dispute that the alleged actions were under color of state law." (ECF No. 57, p. 5). Williams claims that Kane deprived M.W. of her civil rights by violating the FNHRA. To establish a 1983 claim against Kane, Williams must not only show that M.W.'s rights were violated by a Kane employee; but that the violation of M.W.'s rights was "caused by action taken pursuant to a municipal policy or custom." *Robinson v. Fair Acres Geriatric Ctr.*, 722 F. App'x 194, 198 (3d Cir. 2018). Williams must also show that the municipal policy or custom "was the proximate cause of the injuries suffered." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). Kane moves for summary judgment on Williams' 1983 claim (ECF No. 54), arguing that Williams cannot establish that a Kane employee violated M.W.'s FNHRA rights, and, even if the evidence created a question of fact regarding whether an employee violated M.W.'s FNHRA rights, "the claim would still fail because no violation was caused by Kane policies." (ECF No. 57, p. 10).

Under the FNHRA, nursing facilities must "maintain clinical records on all residents, which records include the plans of care . . . and the residents' assessments . . . as well as the results of any pre-admission screening[.]" 42 U.S.C. § 1396r (b)(6)(C). Williams claims that Kane nurses violated M.W.'s FNHRA rights by failing to sufficiently document and monitor M.W.'s wound

---

[1] Despite being titled as a claim for negligence (*See* ECF No. 1, p. 12), "Count I of the Complaint asserts a § 1983 claim, not negligence." (ECF No. 68, p. 5).

from May 24, 2019, to May 28, 2019, the day M.W. was transported to UPMC Presbyterian Hospital for amputation. (ECF No. 68, pp. 6-7). Williams bases this claim on a gap in Kane's General Progress Notes ("GPN") for M.W.'s wound from May 24, 2019, to May 28, 2019 (ECF No. 56-4), arguing that the gap shows that "daily wound care services did not occur according to the Vascular surgeon's order; nor to Kane's wound care policy or the FNHRA's requirements[]" on those dates. (ECF No. 68, p. 4) (cleaned up).

Despite a lack of notes in the GPN on these dates, Kane still maintained a TAR, which indicates that a Kane employee approved and documented the cleaning and treatment of M.W.'s wound in accordance with the vascular surgeon's most recent instructions every day from May 22, 2019 to May 28, 2019. (ECF No. 56-7). As Williams points out, however, Kane's own wound care policies and the FNHRA, in certain circumstances, require more than documenting the cleaning and treatment provided. Kane's wound care policy requires staff to "[m]onitor and document progress of the wound in the GPN and notify physician promptly if wound should appear more acute or worsen." (ECF No. 56-13, p. 3). Under the FNHRA, Kane is required to maintain clinical records of "the residents' assessments[.]" 42 U.S.C. § 1396r (b)(6)(C). A gap in the GPN does not necessarily mean that the FNHRA or Kane's wound care policy have been violated. If the status of M.W.'s wound stayed the same from May 24, 2019, to May 28, 2019, the gap in the GPN would not violate Kane's wound care policy; the policy would only be violated if Kane staff failed to document progress or to report deterioration. Under the FNHRA, Kane was required to update M.W.'s clinical records with any change to the assessment of M.W.'s wound, but, if there was no change to the assessment of M.W.'s wound, no action would be required to maintain M.W.'s clinical records. Thus, to show that Kane staff violated the FNHRA, Williams must establish that the condition of M.W.'s wound changed from May 24 to May 28.

In an attempt to do so, Williams relies on the expert testimony of Beverley Williams ("Beverley"),[2] who claims that M.W.'s wound had gotten worse between May 23, 2019, and May 28, 2019. (ECF No. 56-12, pp. 27, 34). As Kane points out, however, Beverley was unable to explain the basis for her assertion that there was a "huge difference" in M.W.'s wound from May 24, 2019, to May 28, 2019. She testified that she was not in M.W.'s room when wound care services were provided on the days in question, she has not spoken with the staff members who provided those services, and she could not offer an opinion on the size of M.W.'s wound when it was examined by the vascular surgeon on May 28, 2019. (*Id.*). She further testified that she only reviewed the medical records contained in Kane's chart and that she did not review any of the medical records from M.W.'s vascular surgeon. (*Id.* at 11, 28). Nothing in the record—beyond Beverley's assertion—supports the notion that the condition of M.W.'s wound worsened from May 24 to May 28.

Williams argues that Kane cannot use the lack of any documented change in M.W.'s wound status from May 24 to May 28 as evidence that the wound did not worsen in that time. To do so, Williams argues, would be to reward Kane for the very "gap" in medical records that forms the crux of Williams' claim against Kane. While true, Williams still bears the ultimate burden of establishing that Kane violated M.W.'s FNHRA rights and could have satisfied that burden through expert witnesses, depositions, or by citing to relevant medical records. Outside of the testimony of Beverley—who was not with M.W. for the days in question, had not spoken to the Kane staff or the vascular surgeon who treated M.W., and had not reviewed any of the vascular surgeon's records—Williams provides no such evidence. He did not depose the Kane staff who treated M.W. on the dates in question or the vascular surgeon who ultimately performed M.W.'s

---

[2] Beverley Williams is the wife of Plaintiff Darrell Williams. *See* (ECF No. 56-12, p. 8).

amputation. Given the lack of evidence that the condition of M.W.'s wound changed during this period, Williams has failed to establish that the five-day gap in Kane's GPN was a violation of Kane's internal wound care policies or the FNHRA.

Even if Williams could show that a Kane employee violated M.W.'s FNHRA rights, he has still failed to show that the violation was "caused by action taken pursuant to a municipal policy or custom." *Robinson,* 722 F. App'x at 198. Williams argues that the violation of M.W.'s FNHRA rights "was caused by the Kane's 'custom' of repeated failure of the LTC nurses to document wound status[.]" (ECF No. 68, p. 9). In the § 1983 context, customs "include only 'practices of state officials . . . so permanent and well settled as to constitute a custom or usage with the force of law.'" *Robinson,* 722 F. App'x at 198 (quoting *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691 (1978)). Even if Kane staff's failure to document any changes to M.W.'s wound status in the GPN for five days was a violation of M.W.'s FNHRA rights, there is nothing in the record to indicate that Kane nurses failing to document wound status is "permanent" and "well settled." A lack of notes in M.W.'s GPN for five days is not sufficient evidence to establish that Kane nurses' failure to document wound status was "so permanent and well settled as to constitute a custom or usage with the force of law." *Monell,* 436 U.S. at 691.

Even if Williams could establish that Kane nurses engaged in a custom of failing to document wound status, he has also failed to show causation. *Berg v. Cnty. of Allegheny,* 219 F.3d 261, 276 (3d Cir. 2000) ("Once a § 1983 plaintiff identifies a municipal policy or custom, he must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (internal quotations omitted)). Williams' causation argument—that "Kane's LTC wound care practice was the proximate cause of M.W.'s injuries suffered[]"—is based only Beverly's opinion that, had M.W.'s wound been more closely monitored between May 23, 2019,

and May 28, 2019, amputation of M.W.'s leg may have been avoidable. (ECF No. 68, p. 7); (ECF No. 56-12, pp. 27, 34). Here again, Beverley was unable to establish the basis for this opinion and Williams is unable to point to any other evidence to establish causation.

In certain circumstances, causation can be established by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997). To show that a municipality's actions constitute "deliberate indifference" under § 1983, "it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (footnote omitted). Failure to train, monitor, or supervise employees can "be considered deliberate indifference . . . where the failure has caused a pattern of violations." *Berg,* 219 F.3d at 276. Even if Williams could show that Kane staff violated M.W.'s rights and that those violations were caused by Kane's failure to properly train or monitor nurses who were responsible for documenting M.W.'s wound status, he presents no evidence to show that the failure caused a pattern of violations. Other than the five-day gap in M.W.'s GPN, Williams does not allege any violations by Kane, let alone a "pattern of violations." Additionally, nothing in the record indicates that Kane nurses' documentation of wound status involved a difficult choice, a history of being mishandled, or a "pattern of violations."

Williams has failed to show that Kane's five-day gap in M.W.'s GPN constituted a violation of M.W.'s FNHRA rights. Even if he had done so, Williams also failed to establish causation or that any violation was caused by a Kane policy or custom. Kane's motion for summary judgment (ECF No. 54) will be granted.

### C. Aetna's Motion for Summary Judgment (ECF No. 58)

Aetna moves for summary judgment on the claims against it for breach of fiduciary duty (Count II), breach of contract (Count III), and breach of good faith and fair dealing (Count IV). (ECF No. 58).

1. <u>Count II: Breach of Fiduciary Duty</u>

Williams claims that Kane violated its fiduciary duty under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (Count II). (ECF No. 1, ¶¶ 67, 71). ERISA—and the duties it imposes on fiduciaries—only applies to employee benefit plans, which, according to the statute's definition, must be "established or maintained by an employer or by an employee organization, or by both[.]" 29 U.S.C. §§ 1002(1), (2). M.W.'s plan was not established or maintained by an employer or employee organization. Rather, M.W. was a member of a Medicare Advantage PPO Plan offered by Aetna. (ECF No. 61-2); (ECF No. 1, ¶ 20). The Plan explicitly stated that it was "a Medicare Advantage PPO Plan[.]" (ECF No. 61-2, p. 3). Because Aetna's coverage of M.W. was not an employer health plan governed by ERISA, Williams cannot pursue a claim for breach of fiduciary duty under ERISA.

In his response to Aetna's motion for summary judgment, Williams attempts to shift the allegation by arguing that "[i]n view of the entirety of the Complaint, Count II of the Complaint alleges that Aetna breach[ed] its fiduciary duty under the Medicare laws, rules, and guidelines on coverage for SNF services." (ECF No. 70, p. 5). However, the Complaint explicitly alleges that Aetna "is a fiduciary of the Plan within the meaning of [ERISA]" and that he is "entitled to relief under [ERISA]." (ECF No. 1, ¶¶ 67, 71). Nothing in the Complaint indicates that Williams intended to assert his breach of fiduciary duty claim under "the Medicare laws" and Williams "may not expand his claims to assert new theories for the first time in response to a summary judgment

motion." *Ward v. Noonan*, 147 F. Supp. 3d 262, 280 n.17 (M.D. Pa. 2015). As such, the Court construes Williams' breach of fiduciary duty claim as being brought pursuant to ERISA. Because the Plan at issue is not governed by ERISA, Aetna's motion for summary judgment (ECF No. 58) will be granted as it relates to Williams' claim for breach of fiduciary duty (Count II).

2. Counts III & IV: Breach of Contract and Breach of Good Faith and Fair Dealing

   a. *Exhaustion of Administrative Remedies*

Williams also brings claims against Aetna for breach of contract (Count III) and breach of good faith and fair dealing (Count IV). Aetna first argues that both claims should be dismissed at summary judgment because M.W. failed to exhaust the administrative remedies available under the Medicare appeals process. "Title 42 U.S.C. § 405(h), . . . makes § 405(g) the sole avenue for judicial review of all 'claim[s] arising under'" 42 U.S.C. § 1395 *et seq.* ("Medicare Act"). *Heckler v. Ringer*, 466 U.S. 602, 602 (1984). *See also Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000) (Section 405(h) "demands the 'channeling' of virtually all legal attacks through the agency[.]"). A claim "arises under" the Medicare Act if "'both the standing and the substantive basis for the presentation' of the claims is the Medicare Act[,]" or if the claim is "inextricably intertwined" with a claim for Medicare benefits. *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1073 (3d Cir. 1992) (quoting *Heckler,* 466 U.S. at 615). Williams' claims against Aetna are based on the allegation that Aetna wrongfully denied M.W. Medicare coverage for her to stay at Kane's SNF facility after May 18, 2019. There is no dispute that these claims "arise under" the Medicare Act. *See* (ECF No. 70, p. 6) ("The Plaintiff's claims are governed by the Medicare rules and regulations[.]").

Under § 405(g), a plaintiff may bring a claim "arising under" the Medicare Act in district court only after he "has pressed the claim through all designated levels of administrative review[]"

and has been given a "final decision" from the Secretary of Health and Human Services. *Heckler,* 466 U.S. at 606. *See also Kopstein v. Indep. Blue Cross,* 339 F. App'x 261, 264 (3d Cir. 2009) ("A final agency ruling is . . . 'central to the requisite grant of subject-matter jurisdiction' under the Medicare Act."). After the Medicare insurer "makes an initial determination on an application for Medicare benefits and/or entitlement of an individual to receive Medicare benefits[,]" there are four levels of administrative review that must be exhausted before a plaintiff is entitled to judicial review. 42 C.F.R. § 405.904(a)(1). First, if the enrollee is not satisfied with the initial determination, he may request—and "[t]he organization shall provide"—reconsideration by a QIO contracted by the Centers for Medicare Studies ("CMS"). 42 U.S.C. § 1395w-22(g)(2)(A). *See also id.* Next, "[r]econsiderations that affirm a denial of coverage, in whole or in part[,]" are reviewed by QIC. *Id.* § 1395w-22(g)(4). If the enrollee remains unsatisfied after this review by the QIC, the third level of administrative review requires him to request a hearing before an ALJ. 42 C.F.R. § 405.904(a)(1). As the final step, "[i]f the beneficiary obtains a hearing before an ALJ and is dissatisfied with the decision of the ALJ, or if the beneficiary requests a hearing and no hearing is conducted," he may request a review from the MAC. *Id.* §§ 422.608, 405.904(a)(1).

There is no dispute that M.W. exhausted the first three levels of administrative review. After being informed of Aetna's initial determination that she was not covered to stay in Kane's SNF after May 18, 2019, M.W. appealed to the QIO, which affirmed Aetna's initial determination of noncoverage. (ECF No. 64, ¶ 10); (ECF No. 1, ¶ 31). M.W. then submitted a request for an expedited reconsideration by the QIC, C2 Innovative Solutions. (ECF No. 1-2, p. 7). When the QIC returned an unfavorable decision to M.W., she filed a timely request for review with the OMHA and participated in a hearing in front of the ALJ in August of 2019. After receiving an unsatisfactory decision from the ALJ, M.W. filed a Request for Review of the ALJ Decision with

the MAC, dated November 1, 2019. (ECF No. 1-3, p. 2); (ECF No. 1, ¶ 49); (ECF No. 60, ¶ 71). Sometime in December of 2019 or January of 2020, M.W. received an Acknowledgment of Request for Review from the Departmental Appeals Board, stating that "it may be several months before the Medicare Appeals Council can act on your request for review." (ECF No. 61-19, p. 2).

Williams claims that "[t]here are no November, 2019 appeals still pending in the MAC," but provides no evidence that M.W. received a final decision from the MAC. (ECF No. 70, p. 6). Williams testified that, as of January 26, 2023, he had not received a decision on the appeal filed with the MAC. (ECF No. 66-1, pp. 152-53). He further testified that, aside from the Acknowledgement of Request for Review, he has not received anything from the MAC. (*Id.* at 152). As M.W.'s representative, Williams could have requested judicial escalation from the MAC if no decision was rendered 90 calendar days after M.W. filed her Request for Review. 42 C.F.R. § 405.1132. Williams admits that he has not done so; nor has he had any other communications with the MAC. (ECF No. 66-1, pp. 152-53). A plaintiff is entitled to judicial review only after they have received an adverse final decision. *See* 20 C.F.R. § 404.900 ("If you are dissatisfied with our final decision, you may request judicial review by filing an action in a Federal district court."). Given this, and because there is no evidence that Williams or M.W. received a final decision from the MAC, he has failed to establish that he or M.W. exhausted each step of the administrative review process.

   b. *Preemption*

Even if Williams had received a final decision from the MAC, his breach of contract and breach of good faith and fair dealing claims are preempted by the Medicare Act. Congress can displace state law where preemption is the "clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The Medicare Act contains an express preemption

provision, which says that "[t]he standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." 42 U.S.C. § 1395w-26(b)(3). The existence of this clause, however, "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Here, the Court must determine whether the Medicare Act's preemption provision preempts state common law claims; namely, claims for breach of contract and breach of good faith and fair dealing.

The language "any State law or regulation"—with no qualifying provisions—reflects an intent to include common law claims. *See Fleck v. KDI Sylvan Pools Inc.*, 981 F.2d 107, 115 (3d Cir. 1992) ("The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive."). This does not mean, however, that the Medicare Act preempts all state common law claims; only those that are inconsistent with "the standards established" by the Medicare Act. 42 U.S.C. § 1395w-26(b)(3). As Williams acknowledges, his breach of contract and breach of good faith and fair dealing claims are premised on the allegation that Aetna wrongfully denied M.W. specific coverage under the Medicare regulations and guidelines. *See* (ECF No. 70, p. 6) ("The Plaintiff's claims are governed by the Medicare rules and regulations[.]"). Williams does not claim that Aetna was subject to any contractual obligations beyond its obligation to comply with the Medicare Act. At their core, Williams' breach of contract and breach of good faith and fair dealing claims are coverage disputes. The Medicare regulations and the CMS Medicare Benefit Policy Manual establish the standards for Medicare coverage of SNF services. *See* 42 C.F.R. § 409.31; (ECF No. 61-4). The Medicare Act's administrative appeal process is the exclusive avenue for resolving "disputes involving a covered individual's dissatisfaction with a

Medicare decision[.]" *Wilson v. Chestnut Hill Healthcare*, No. CIV.A. 99-CV-1468, 2000 WL 204368, at *3 (E.D. Pa. Feb. 22, 2000). At the conclusion of that administrative appeal process, Williams would have been entitled to seek judicial review under 42 U.S.C. § 405(g). He cannot, however, assert a "breach of contract claim [as] a backdoor attempt to enforce the Act's requirements and to secure a remedy for [Aetna's] alleged failure to provide [coverage]." *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1143 (9th Cir. 2010).

Because Williams has not established that he exhausted all available administrative remedies, the Court does not have valid subject-matter jurisdiction over his breach of contract (Count III) and breach of good faith and fair dealing (Count IV) claims. Even if Williams did exhaust the available administrative remedies, both claims are preempted by the Medicare Act. Aetna's motion for summary judgment (ECF No. 58) will be granted. The Court need not address the issue of whether Aetna Inc. or Aetna Health Inc. are proper parties to this action.

## IV. Conclusion

For the reasons set forth above, Williams' Motion for Summary Judgment (ECF No. 63) will be denied; Kane's Motion for Summary Judgment (ECF No. 54) will be granted; and Aetna's Motion for Summary Judgement (ECF No. 58) will be granted. Aetna's Motion to Strike Plaintiff's Appendix Exhibits B and C (ECF No. 74) will be denied as moot. Orders of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

6/28/2023
Dated